**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re: ) | |
| ) | |
| 11380 SMITH ROAD, LLC, ) | Case No. 18-10965 |
| EIN: 46-4766309, ) | Chapter 11 |
| ) | |
| Debtor. ) | |
| ) | |

**11380 EAST SMITH RD INVESTMENTS, LLC'S, MOTION: (I) FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO SECTION 362(D)(1) OF THE BANKRUPTCY CODE; AND (II) TO DISMISS THIS CHAPTER 11 BANKRUPTCY CASE FOR BAD FAITH PURSUANT TO SECTION 1112(B) OF THE BANKRUPTCY CODE**

COMES NOW 11380 East Smith RD Investments, LLC ("**Lender**"), the Debtor's prepetition secured lender, for its Motion: (I) for Relief From the Automatic Stay Pursuant to Section 362(d)(1) of the Bankruptcy Code; and (II) to Dismiss this Chapter 11 Bankruptcy Case for Bad Faith Pursuant to Section 1112(b) of the Bankruptcy Code (the "**Motion**"). In support of the Motion, Lender states as follows:

### Introduction

1.     This Chapter 11 case is the poster child for "bad faith" single asset real estate cases as practically all of the *Little Creek* factors are satisfied in addition to other relevant factors under applicable case law of this District. The Debtor's only meaningful asset in this case is the real estate it owns, and the Debtor was formed for the purpose of generating income from commercial leases by tenants who are owned solely by the Debtor's equity. The leases have been in default and non-performing since the middle of 2017 with no efforts by the Debtor to enforce the terms thereof. The Debtor commenced this case on the eve of the Lender's properly noticed Trustee's Sale that was initiated on account of Lender's note maturing by its terms over 5 months prepetition and remaining unpaid. The Debtor has no business operations, generates no cash flow, and has not found replacement tenants for the property since the current tenants (both of whom are owned by the Debtor's principal) quit paying rent since the middle of 2017. The Debtor has no employees, no other meaningful assets, and only has two remaining unpaid unsecured creditors. Thus, this case neatly fits within that "certain recurring" fact pattern which the *Little Creek* factors were modeled after for findings of bad faith under both Sections 362(d)(1) and 1112(b) of the Bankruptcy Code. Perhaps the only distinguishing factor from *Little Creek* type cases is that Lender is oversecured.

2.     Adding to the "conglomerate" of bad faith *Little Creek* facts, just days before this case was filed, the Debtor received an offer of $5,500,000 to purchase the property which would

have paid off all of the Debtor's creditors in full and produced a return of more than $700,000 to the Debtor's equity. However, as testified to at the 341 Meeting, the Debtor never informed the Lender of such offer and rejected the offer because "it was too low". Such facts highlight that the Debtor is purely interested in finding the highest price possible in order to maximize the return to its equity holder while ignoring its duties to its creditors. Further underscoring the Debtor's self-interested approach and bad faith in this case, is that the Debtor's plan requests 1 year to either sell the property or refinance the note while at the same time asking the Court to lower the bargained for interest rate from 28% under the Note. Debtor's requests result in additional delay while depriving Lender of its only adequate protection, *i.e.*, the accrual of default interest. In this solvent estate where all creditors will be paid in full upon a sale of the property, Debtor should not be permitted to delay a disposition of the property—purely motivated by Debtor's equity's self-interests in obtaining the highest price possible—while avoiding paying bargained for default interest. Such a scenario unjustifiably takes the dollar out of Lender's pocket and puts it directly into Debtor's equity's pocket. Bankruptcy relief cannot be used under these circumstances.

3.  Accordingly, Lender submits that this Chapter 11 case was filed in bad faith and that "cause" exists to grant relief from the automatic stay under Section 362(d)(1) of the Bankruptcy Code, and dismiss the case under Section 1112(b). However, to the extent the Court does not dismiss the Debtor's case, "cause" still exists to convert the case to Chapter 7 as doing so would also be in the best interests of all creditors.

## Jurisdictional Statement

4.  This Court has jurisdiction over this Chapter 11 case pursuant to 28 U.S.C. §§ 157(a)-(b), and 1334(a)-(b). This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (G). Venue is proper in this Court pursuant to 28 U.S.C. § 1409. The statutory and rule based predicates for the relief requested in the Motion are Sections 362(d)(1) and (3), and 1112(b) of the Bankruptcy Code, Rules 4001 and 1017 of the Bankruptcy Rules and L.B.R. 2081-3 and 4001-1.

## Background

A.  **Prepetition Loan Obligations.**

5.  On October 25, 2016, the Debtor made, executed and delivered its promissory note to Lender in the principal amount of $3,000,000 (the "**Note**") as required under that certain loan agreement between Debtor and Lender (the "**Loan Agreement**"). A true and correct copy of the Note and Loan Agreement are attached hereto as Exhibit A.

6.  On October 25, 2016, in order to secure the obligations due and owing under the Note, the Debtor executed a Deed of Trust, Security Agreement, Financing Statement and Assignment of Rents and Revenues (the "**DOT**") in favor of Lender. A true and correct copy of the DOT is attached hereto as Exhibit B.

7.     The DOT granted Lender a first-position security interest in the real property commonly known as 11380 East Smith Road, Aurora, Colorado 80010 (the "**Property**"). Lender perfected its security interest in the Property, on October 26, 2016, when it recorded a copy of the DOT with the Clerk and Recorder of Adams County, Colorado, as Reception No. 2016000091839.

8.     To further secure the obligations due and owing under the Note, Debtor executed an Assignment of Rents and Leases (the "**AOR**") in favor of lender. A true and correct copy of the AOR is attached hereto as Exhibit C.

9.     The AOR granted a security interest to Lender in all of the "rents, issues, earnings, income, profits, benefits and advantages arising from the Property and from said Leases and all other sums due or to become due under and pursuant thereto . . .". (Ex. C at p. 2). On October 26, 2016, Lender recorded a copy of the AOR with the Clerk and Recorder of Adams County, Colorado, as Reception No. 2016000091840.

10.    In connection with the loan, Debtor presented Lender with two separate leases which burdened the Property. The first lease was between the Debtor and Hi-Tec Plastics, Inc. ("**HTP**"), with a term that runs through December 31, 2018 2018 (the "**HTP Lease**"). The second lease was between the Debtor and Hi-Tec Recycling, Inc. ("**HTR**"), with a term that runs through December 31, 2018 (the "**HTR Lease**"). A true and correct copy of the HTP Lease and the HTR Lease are attached hereto as Exhibit D.

11.    The Debtor's authorized representative and sole equity holder, Mr. Louis Hard ("**Mr. Hard**"), is the registered agent for both HTP and HTR.

12.    Debtor failed to make the regular payments due under the Note for the months of July 2017, August 2017, September 2017 and October 2017. Attached hereto as Exhibit E is the Affidavit of Mr. Patrick Dunn.

13.    On October 25, 2017, the Note matured by its terms, and the Debtor failed to repay the obligations due and owing thereunder according to the terms thereof. *See* Ex. E.

14.    Prior to the commencement of this Chapter 11 case, Lender had properly noticed a Trustee's Sale of the Property that was set for February 14, 2018 at 10:00 a.m. (the "**Trustee's Sale**"). A true and correct copy of the notice of Trustee's Sale is attached hereto as Exhibit F.

**B.    The Debtor's Bankruptcy Case.**

15.    On February 13, 2018 (the "**Petition Date**"), the Debtor initiated this bankruptcy case when he filed his voluntary petition for relief under Chapter 11 of the Bankruptcy Code. (Docket No. 1).

16.    The Debtor filed this case as a single asset real estate entity as such term is defined under Section 101(51B) of the Bankruptcy Code. (*Id*. at p. 2).

17. The Debtor's Summary of Assets and Liabilities indicate that the Debtor is solvent with assets totaling $9,136,236.52 and liabilities totaling $4,763,638.47. (*Id*. at p. 12).

18. The Debtor's Schedule A identifies the Property. (*Id*. at p. 13).

19. The Debtor's Schedule B identified only three assets: (i) intercompany loans between the Debtor and HTR and HTP in the amount of $4,365,682.00 which the Debtor acknowledged are likely uncollectible; (ii) A/R in the amount of $135,752.22; and (iii) a legal claim against an insurance company relating to a hail damage claim that the Debtor values at $2,500,000. (*Id*. at p. 13-15).

20. The Debtor's Amended Schedule D values the Property at $6,500,000.00 and identified Lender's secured claim in the amount of $3,531,638.47 and a secured claim in favor of the Adams County Treasurer in the amount of $56,752.39. (Docket No. 36).

21. The Debtor's Amended Schedule F identified only three unsecured creditors: (i) Tim Henzel in the amount of $1,200,000 ("**Henzel**"), (ii) Owners Insurance Company in an "unknown" amount that is disputed, contingent and unliquidated, and (iii) Xcel Energy in the amount of $32,000. (Docket No. 37).

22. The Debtor's Schedule G says that the Debtor has no executory contracts and/or unexpired leases. (*Id*. at p. 20).

23. The Debtor is owned entirely by Mr. Hard. (Docket No. 5).

**C.    The Debtor's 341 Meeting.**

24. On March 23, 2018, Mr. Hard testified on behalf of the Debtor at the first meeting of creditors (the "**341 Meeting**"). Additionally, the Debtor's bookkeeper, Ms. Gallegos, also testified under oath at the 341 Meeting. A complete transcript of the 341 Meeting is attached hereto as Exhibit G.[1]

25. The Debtor testified to, *inter alia*, the following facts:

   i. Mr. Hard was personally the sole owner of both HTR and HTP. (Ex. G at 8:3-11);

   ii. That Debtor's purpose was to collect the rents from both HTR and HTP. (*Id*. at 8:18-21);

   iii. That, historically, the Debtor had no routine operating expenses and that the rents were paid "just on the mortgage". (*Id*. at 9:1-15);

---

[1] In addition to the Transcript of the 341 Meeting, the Lender can supply the audio recording of the 341 Meeting it has received from the Office of the United States Trustee for the Court's convenience.

4

4829-5610-8385.2

iv. That HTR and HTP stopped paying rent to the Debtor in the middle of 2017 which, in part, led to the Debtor's filing for bankruptcy; (*Id*. at 17:20-20:7);

v. That HTR was liquidated in December of 2017, and that HTP was sold to Universal Plastics ("**Universal**") in January of 2018; (*Id*. at 8:8-17);

vi. That HTR and HTP are no longer operating their businesses at the Property; (*Id*.);

vii. That HTR and HTP are not currently paying rent to the Debtor. (*Id*. at 25:23-25);

viii. That the HTR Lease and HTP Lease have not been terminated. (*Id*. at 50:4-19);

ix. That the Debtor permits Universal, pursuant to an unwritten understanding, to remain in the Property charging it only $200 per day commencing in the month of April 2018. (*Id*. at 58:24-59:11);

x. That Xcel Energy's prepetition debt was paid in full after the Petition Date with money loaned by HTP. (*Id*. at 60:6-18);

xi. That Debtor has taken no steps to enforce any claims it may have against HTR and HTP for breach of their respective leases; (*Id*. at 50:4-16);

xii. That Debtor has some existing A/R against some former tenants who used to occupy a property the Debtor previously owned. (*Id*. at 61:14-62:20);

xiii. That Debtor has taken no formal action to collect the A/R owing from the former tenants, and that such A/R is approximately 6 months past due. (*Id*. at 62:14-15);

xiv. That Debtor received an offer before the Petition Date to sell the Property for $5.5 million. (*Id*. at 52:6-20);

xv. That Debtor did not accept the offer to purchase the Property because "it was too low" and that the sale could not be closed before the Trustee's Sale. (*Id*. at 53:1-9);

xvi. That Debtor values the Property at $6,500,000 upon receiving a broker's opinion of valuation, but has also received an appraisal that valued the Property at $8,250,000. (*Id*. at 50:20-51:16);

xvii. That Debtor never informed Lender, at any point, of the $5.5 million offer to purchase the Property (*Id*. at 53:10-12); and

5

4829-5610-8385.2

xviii. That Henzel loaned the Debtor $1.2 million on an unsecured basis. (*Id.* at 46:13-22; 53:13-55:14).

C. **The Debtor's Proposed Chapter 11 Plan.**

26. On March 23, 2018, the Debtor filed its Plan of Reorganization (the "**Plan**") and accompanying Disclosure Statement (the "**Disclosure Statement**"). (Docket Nos. 53-54).

27. The Plan alleges that Lender's secured claim is unimpaired and proposes to treat such claim as follows:

> Class 2. 11380 East Smith Rd Investments, LLC. The holder of the allowed secured claim in Class 2 will be paid from the Net Proceeds from the sale or refinance of the Debtor's Real Property on the Effective Date. *The allowed secured claim of the Class 2 creditor shall be paid by the cure and deceleration of any default under the promissory note, and payment in full of such amount plus any amount which the Class 2 creditor may be entitled to as damages under 11 U.S.C. §1124(2) on the Effective Date*. To the extent that the Debtor and the Class 2 creditor dispute any such amount, such amount shall be determined by the Court. To the extent that any allowed secured claim of the Class 2 creditor is not paid in full, such unpaid amount shall be allowed as an unsecured claim and paid as provided for in Class 3 of the Plan. Upon payment in full, the lien securing the Class 2 claim shall be released.

(Docket No. 53 at p. 7, § 3.1) (emphasis added).

28. The Plan is silent as to how the Debtor is able to "cure" the defaults under the Note and "decelerate" the Note which matured over five (5) months ago.

29. The Debtor intends to implement the Plan as follows:

> (e) The Debtor will continue to list its Real Property for sale or refinance and will pay the holders of allowed secured claims secured by lien(s) on the Debtor's Real Property from the Net Proceeds from the sale or refinance of its Real Property on the Effective Date.

> (f) The Debtor will provide adequate protection to the holders of allowed secured claims secured by an interest in its Real Property pending the sale or refinance of its Real Property by continuing maintenance of the Real Property, insurance and taxes.

> (h) In the event of a closing on the sale or refinance of the Debtor's Real Property prior to a resolution of the amount of the Class 2 creditor's secured claim, the Debtor shall, in consultation with counsel for the Class 2 creditor, provide for adequate Net Proceeds to be escrowed for the benefit of the holder of the Class 2

6

    claim ***plus appropriate interest pending a determination by the Court of the amount of the Class 2 creditor's claim***.

(*Id*. at p. 11-12, §§ 6.1(e), (f) and (h)) (emphasis added).

30.     The Plan's "effective date" occurs once a sale or refinance of the Property occurs. (*Id*. at p. 3, §§ 1.10 and 1.17).

31.     According to an errata to the Plan filed by the Debtor, the Debtor hopes to sell or refinance the Property within one (1) year after the confirmation order of the Plan has gone final. (Docket No. 59).

## Relief Requested

32.     Lender requests that this Court enter an order which: (i) grants Lender relief from the automatic stay as to the Property under Section 362(d)(1) of the Bankruptcy Code; (ii) dismisses this Chapter 11 case under Section 1112(b) of the Bankruptcy Code; and (iii) to the extent the Court does not grant stay relief and/or dismiss the Chapter 11 case, converts the Debtor's case to Chapter 7.

## Basis for Relief Requested

**A.**     **Relief From the Automatic Stay for "Cause" Under Section 362(d)(1) of the Bankruptcy Code.**

33.     Section 362(d)(1) of the Bankruptcy Code permits a party in interest, after notice and a hearing, to seek relief from the automatic stay for "cause". *See* 11 U.S.C. § 362(d)(1); *In re JE Livestock, Inc.*, 375 B.R. 892, 897 (B.A.P. 10th Cir. 2007) ("While cause under § 362(d)(1) includes 'the lack of adequate protection of an interest in property,' it is not so limited. . . Because 'cause' is not further defined in the Bankruptcy Code, relief from stay for cause is a discretionary determination made on a case by case basis.").

34.     The Tenth Circuit Court of Appeals has recognized that a bankruptcy case that is filed in bad faith can serve as independent "cause" for purposes of Section 362(d)(1). *See In re Nursery Land Development, Inc.*, 91 F.3d 1414, 1416 (10th Cir. 1996); *Pacific Rim Invs., LLP v Oriam, LLC (In re Pacific Rim Invs., LLP)*, 243 B.R. 768 (D. Colo. 2000). In the context of single asset real estate cases, "[f]indings of lack of good faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum." *In re Platte River Bottom, LLC*, 2016 Bankr. LEXIS 186 at *27-28 (Bankr. D. Colo. 2016) (citing *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072-73) (5th Cir. 1986)). The following non-exclusive "conglomerate of factors" are applied to determine whether a single asset real estate debtor has filed its case in bad faith:

    (i) the debtor has one asset, such as a tract of undeveloped or developed real property; (ii) the secured creditor's liens encumber the tract; (iii) there are

generally no employees except for the principals; (iv) there is little to no cash flow; (v) there are no available sources of income to sustain a plan of reorganization or to make adequate protection payments; (vi) there are only a few, if any, unsecured creditors whose claims are relatively small; (vii) the property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court; and (viii) the debtor and one creditor may have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford.

*In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072-73) (5th Cir. 1986).

35. In addition to the *Little Creek* factors, another division of this Court has stated that the following are relevant for purposes of a bad faith failing: (a) the debtor has no ongoing business; and (b) the Chapter 11 filing stopped the foreclosure. *In re Gunnison Ctr. Apts.*, LP, 320 B.R. 391, 399 (Bankr. D. Colo. 2005) (citing *Nursery Land Development, Inc.*, 91 F.3d at 1416)). Furthermore, when a specific purpose of the bankruptcy filing is to "frustrate" a creditor's legitimate foreclosure action bad faith is present. *Nursery Land Development, Inc.*, 91 F.3d at 1416. "Bad faith is found when the cumulative effect of these or other factors leads to the inescapable conclusion that use of the bankruptcy laws by the debtor is inappropriate." *In re H.T. Pueblo Props., LLC*, 2011 Bankr. LEXIS 5231, at *11-12 (Bankr. D. Colo. Dec. 30, 2011).

36. As explained below, numerous indicia of bad faith exists under the *Little Creek* factors and the *Nursery Land* factors. Accordingly, the Court should grant relief from the automatic stay, pursuant to Section 362(d)(1) of the Bankruptcy Code, because "cause" exists when reviewing the cumulative effect of all relevant factors.

      **(i)    The Debtor's Only Meaningful Asset is the Property Which is Encumbered by Lender's First Position Lien.**

37. The Debtor's main asset in this case is the Property, and Lender's DOT validly encumbers the Property with a first position lien. (*Supra* at ¶¶ 6-7 and 18). Furthermore, the Lender's lien—other than any lien held by Adams County for unpaid taxes—is the only encumbrance against the Property. (*Supra* at ¶ 20). While the Debtor purports to have a promissory note payable from HTR and HTP, *i.e.*, intercompany loans, the Debtor has indicated that collection of such payable is "likely uncollectible". (*Supra* at ¶ 19). Additionally, while the Debtor has some outstanding A/R, the Debtor has taken no formal steps to collect such A/R and that the A/R is approximately 6 months outstanding. (*Supra* at ¶¶ 25(xii)-(xiii)). Thus, for all intents and purposes, the Debtor's only real asset is the Property. Accordingly, the 1st and 2nd *Little Creek* factors favor a finding of bad faith.

      **(ii)    The Debtor has 1 Employee and Generates no Cash Flow Whatsoever.**

38. The Debtor appears to have only 1 employee—Ms. Gallegos—a bookkeeper. The Debtor does not generate any income due to the fact that the HTR Lease and HTP Lease are non-performing and in default. (*Supra* at ¶ 25(vi)-(viii)). The HTR Lease and HTP Lease have been

8

non-performing since the middle of 2017, and the Debtor has taken no steps to terminate the leases. (*Supra* at ¶ 25(iv)). Because the Debtor has not terminated the HTR Lease and HTP Lease since the middle of last year, the Debtor has not—and due to the intended trajectory of the Plan being a sale or refinance—taken any steps to find replacement tenants in order to generate new cash flow for the Property. Given the "wait and see" approach of the Plan to eventually locate a new buyer or refinance of the property, there is no cash available to sustain a plan of reorganization. Also, due to the absence of any cash flow, the Debtor cannot follow through on its promise in the Plan to provide adequate protection "by continuing maintenance of the Real Property, insurance and taxes." (*Supra* at ¶ 29). Accordingly, the 3rd, 4th, and 5th *Little Creek* factors all favor a finding of bad faith.

### (iii) The Debtor has Only 2 Remaining Unpaid Unsecured Creditors.

39. The Debtor's schedules reveal that there are only 3 unsecured creditors: (i) Henzel with a claim in the amount of $1,200,000; (ii) Owners Insurance Company in an "unknown" amount that is disputed, contingent and unliquidated, and (iii) Xcel Energy in the amount of $32,000. (*Supra* at ¶ 21). However, the Debtor testified at the 341 Meeting that Xcel Energy's claim had been paid in full post-petition. (*Supra* at ¶ 25(x)). Thus, the only unsecured claimants that remain are those of Henzel and Owners Insurance Company.[2] Accordingly, the 6th *Little Creek* factor favors a finding of bad faith.

### (iv) The Debtor Filed This Chapter 11 Case on the eve of a Foreclosure Sale.

40. As set forth above, this case was filed on the eve of the Trustee's Sale which clearly frustrated the Lender's valid foreclosure action. (*Supra* at ¶¶ 14-15). The Note matured by its terms on October 25, 2017. (*Supra* at ¶ 13). Furthermore, Lender had not received a payment due under the Note since June of 2017. Notwithstanding the pendency of the Trustee's Sale, Debtor turned down an offer to purchase the Property for $5.5 million that would have roughly paid off—*in full*—all of its creditors and would have produced a return to equity of nearly $800,000. (*Supra* at ¶ 25(xiv)). Moreover, Debtor never communicated this offer to Lender in an attempt to put the Trustee's Sale on hold. (*Supra* at ¶ 25(xvii)). When asked at the 341 Meeting why the Debtor did not accept the $5.5 million offer, the Debtor, in part, responded "it was too low". (*Supra* at ¶ 25(xv)). These facts are likely the most egregious facts in the case and demonstrate that, immediately before the Petition Date, the Debtor blatantly ignored its fiduciary duty to its creditors and instead commenced this case solely to find a higher price and deprive Lender of its default interest. Debtor's maneuvers serve only to line the pockets of Debtor's equity to the detriment of Lender's bargained for contractual rights. Accordingly, the 7th *Little Creek* factor favors a finding of bad faith along with the foreclosure factors of *Gunninson Center Apartments* and *Nursey Land Development*.

---

[2] Moreover, Henzel's claim raises additional questions as to its legitimacy. Apparently, Henzel is someone who the Debtor has known over the years who happened to loan the Debtor approximately $1.2 million in order to improve property formerly owned by the Debtor. However, Henzel never took a security interest in the property that his loan proceeds were used to improve. Given the length of relationship between the Debtor and Henzel along with the failure to take any collateral to secure a $1.2 million loan, Lender questions whether Henzel's claim is truly legitimate and at arm's length.

9

4829-5610-8385.2

### (v) The Debtor has no Current Business Operations to Reorganize.

41. "Bad faith is commonly found in single asset cases involving debtors with no current business operations to reorganize." *In re Platte River Bottom, LLC*, 2016 Bankr. LEXIS 186, at *26 (Bankr. D. Colo. 2016); *In re Pacific Rim Investments, LLP*, 243 B.R. 768 (D. Colo. 2000) (Debtor, which owned an office building, filed bankruptcy petition to avoid adverse outcome of state court litigation. Bad faith found even though debtor had equity in the asset and had filed a plan.).

42. In this case, the Debtor has no ongoing business operations to reorganize. The Debtor was formed for the purpose of collecting rents from both HTR and HTP in order to pay the mortgage obligation to Lender. (*Supra* at ¶ 25(ii)-(iii)). The HTR Lease and HTP Lease have been non-performing since the middle of 2017 and both tenants have failed to make any rental payments to the Debtor. (*Supra* at ¶ 25(iv) and (vii)). Furthermore, the Debtor has taken no effort to terminate and enforce the respective leases. (*Supra* at ¶ 25(viii) and (xi). It is unclear whether the Debtor has taken any efforts to find any replacement tenants for HTR and/or HTP. Instead, the Debtor has chosen to let Universal remain in the Property for *de minimis* rent, *i.e.*, $200 per day, for the month of April 2018. (*Supra* at ¶ 25(ix)). Lastly, the Debtor's intention in this Chapter 11—as evidenced through its Plan—is to sell the Property or refinance Lender's Note. (*See* supra at ¶¶ 27 and 29). Thus, there is no reorganization that will occur in this case. Accordingly, Lender submits that the lack of having any business to reorganize is another instance of bad faith. *See In re Platte River Bottom, LLC*, 2016 Bankr. LEXIS 186, at *26.

43. Accordingly, Lender submits that the cumulative effect of the "conglomerate of factors" above lead to the inescapable conclusion that this case was filed in bad faith and that "cause" exists in order to grant relief from the automatic stay under Section 362(d)(1) of the Bankruptcy Code.

### B. Dismissal for "Bad Faith" Pursuant to Section 1112(b) of the Bankruptcy Code.

44. Section 1112(b) of the Bankruptcy Code allows the Court to dismiss this Chapter 11 case for "cause" under 16 enumerated factors. *See* 11 U.S.C. § 1112(b)(4). "While bad faith is not an enumerated factor under § 1112(b), '[i]t is well established under the Bankruptcy Code, as it was under the Bankruptcy Act, that a Chapter 11 Petition must be filed in good faith, and if not, dismissal of the case is an appropriate remedy.'" *In re Springs Hosp., Inc.*, 2006 Bankr. LEXIS 1804, at *8 (Bankr. D. Colo. 2006) (citing *Pacific Rim Invs., LLP v. Oriam, LLC (In re Pacific Rim Invs., LLP)*, 243 B.R. 768, 771 (D. Colo. 2000). "The list of factors that may constitute 'cause' under § 1112(b) is non-exclusive." *In re Springs Hosp., Inc.*, 2006 Bankr. LEXIS, at *8 (citing H.R.Rep. No. 95-595, at 406 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6362). In addition to the factors enumerated in Section 1112(b) of the Bankruptcy Code, the Court may consider the factors identified above for purposes of establishing "cause" under Section 362(d)(1) of the Bankruptcy Code. *See Udall v. FDIC (In re Nursery Land Dev., Inc.)*, 91 F.3d 1414, 1416 (10th Cir. 1996).

45. Lender hereby incorporates its argument made in the above section of this Motion regarding relief from stay under Section 362(d)(1) of the Bankruptcy Code to demonstrate that "cause" exists to dismiss this case pursuant to Section 1112(b). Lender additionally asserts the following facts and circumstances further demonstrate this case was filed in bad faith and should be dismissed for "cause".

### (i) Debtor's Plan is Patently Unconfirmable and Just Leads to Additional Delay.

46. Debtor's proposed Plan intends to pay Lender "the cure and deceleration of any default under the promissory note" under Section 1124(2) of the Bankruptcy Code. (*Supra* at ¶ 27). As of October 25, 2017 and to the present date, there is nothing to "decelerate" as the Note has been due since it matured by its terms, *i.e.*, the bell cannot be un-rung. (*Supra* at ¶ 13). Furthermore, the only possible "cure" at this point would be payment in full of all amounts due and owing thereunder which the Debtor has no ability to satisfy. Thus, the Debtor's Plan cannot satisfy Section 1124(2) of the Bankruptcy Code because such provision does not, and cannot, apply to the fully matured Note. *See Hepner v. PWP Golden Eagle Tree, LLC (In re K&J Props.)*, 338 B.R. 450, 461 (Bankr. D. Colo. 2005) (stating that Section 1124(2) cannot decelerate and reinstate a note that matured prepetition). Furthermore, because Lender is oversecured, any Plan which does not authorize the Lender to receive default interest under the Note leads to Debtor's equity being inequitably enriched and is, thus, not proposed in good faith as required under Section 1129(a)(3) of the Bankruptcy Code. Lastly, the Debtor's Plan is not feasible, pursuant to Section 1129(a)(6) of the Bankruptcy Code, because it requests 1 year to sell the Property or refinance the Note thereby unfairly exposing Lender to the volatilities of the commercial real estate and lending markets. Moreover, the Debtor rejected an offer to sell the Property for $5,500,000 just days prepetition so there is no legitimate justification for needing 1 year to sell the Property. Accordingly, Debtor's Plan cannot comply with Section 1129(a)(1), (3) and (6) of the Bankruptcy Code and is patently unconfirmable.

47. Allowing the Debtor to proceed towards confirmation of a patently unconfirmable Plan merely leads to additional delay which Lender has repeatedly encountered with the Debtor prepetition, *e.g.*, failure to make regular payments when due under the Note dating back to July of 2017, failure to pay the Note when it matured, and initiating this Chapter 11 case on the eve of the Trustee's Sale. The ensuing delay associated with the Debtor's unconfirmable Plan should constitute "cause" under Section 1112(b) of the Bankruptcy Code.

### (ii) Debtor's Plan is Intended to Gore Lender's Ox to the Direct Benefit of Debtor's Equity.

48. Debtor's Plan, which seeks to pay Lender "appropriate interest" as determined by the Court, is clearly intended to reduce the Lender's right to receive default interest. (*Supra* at ¶ 29). Lender is undoubtedly oversecured in this case as the value of the Property is somewhere in the range of $5,500,000 to $8,250,000. (*Supra* at ¶ 25(xiv) and (xvi)). Because Lender is substantially oversecured, Lender is entitled to post-petition default interest, costs and attorneys' fees. *See* 11 U.S.C. § 506(b).

49. The Debtor and Lender contracted for the provision of default interest, at the rate of 28%, in the event the Debtor defaulted on its obligations. (*See* Ex. A – Loan Agreement). The 28% default interest rate was a matter of pricing between the Lender and the Debtor according to the risk of making the loan. In this case, the Debtor defaulted by failing to make required payments under the Note and eventually failing to pay the Note on the maturity date back in October of 2017. These defaults entitle Lender to receive it's bargained for default interest rate of 28% which the Debtor agreed to pay upon default. Assuming the Debtor is able to sell the Property for $6,500,000, **all** 3 remaining creditors in this case would be paid in full (the aggregate amount of all unpaid scheduled claims is approximately $4,788,390.86). Such a scenario would result in the Debtor's equity receiving approximately more than $1,700,000. Thus, the obvious intent of the Debtor's Plan is to avoid paying default interest which has the effect of putting more money directly in the Debtor's equity's pocket in lieu of paying Lender according to the Note which the Debtor executed. There is no equitable justification for goring the Lender's ox when: (i) the estate is solvent, (ii) the few other unsecured creditors will be paid in full from the proceeds of a sale of the Property, and (iii) the Debtor's equity will be receiving a substantial distribution from the remaining proceeds. Why should the Debtor be given 1 year to sell the Property which allows its equity to further line their pockets while being permitted to avoid paying its bargained for default interest to Lender? A bankruptcy case cannot be filed in good faith when a debtor's goal is to wrongfully deprive an oversecured lender of bargained for interest for the direct benefit of the debtor's equity.[3] *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 119 (3rd Cir. 2004) ("At its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy.").

50. Further, Lender asserts that *In re Consolidated Operating Partners, LP,* 91 B.R. 113 (Bankr. D. Colo. 1988), is instructive on the foregoing. In *In re Consolidated Operating Partners*, the Bankruptcy Court considered whether a secured creditor of a solvent debtor should be allowed to charge and collect default interest. The Court held that, because the debtor was solvent, an order precluding the lender from charging and collecting default interest would only inure to the benefit of the debtor's equity owners, and give them a windfall, which would be improper and inequitable:

> The Court is not persuaded by the debtor's argument that in this instance strict adherence to the parties' interest rate is not required by 11 U.S.C. § 506(b). 11 U.S.C. § 506(b) gives an oversecured creditor the right to accrue interest at the rate provided for under the agreement between the creditor and its debtor. *In re Skyler Ridge,* 80 B.R. 500 (Bankr. C.D. Calif. 1987). The equities of this case do not favor any deviation from the imposition of the Late Payment Rate. The benefit derived from any reduction in the contract rate would not inure to the creditors but instead would be a windfall to the debtor. Such a result would mean that any solvent debtor seeking to avoid the cost of default rate interest could file for Chapter 11. No such result was intended by Congress. Under the circumstances of

---

[3] Lender again notes that at no point did Debtor ever communicate the existence of the $5,500,000 offer to purchase the Property that was made just days before the Petition Date.

4829-5610-8385.2

> this case, the debtor should be held to the Late Payment Rate agreed to prior to the debtor's bankruptcy filing.
> *Id*. at 117.

For the reasons asserted above, the equities of this case do not favor a departure from the parties bargained for contractual interest rate as doing so would only benefit the Debtor's equity.

51. Moreover, a 28% default interest rate is not a penalty under Colorado law and is well within the range of reported cases within this District for authorizing default interest to oversecured lenders. *See Hepner v. PWP Golden Eagle Tree, LLC (In re K&J Props.)*, 338 B.R. 450 (Bankr. D. Colo. 2005) (approving a 36% default interest rate for oversecured creditor's claim); *In re Wood Family Interests, Ltd.*, 135 B.R. 407 (Bankr. D. Colo. 1989) (approving a 24% default interest rate for oversecured creditor's claim). The facts of this case are remarkably similar to those of *Hepner*, where the secured creditor's note matured prepetition and the secured creditor was oversecured. *Hepner*, 338 B.R. 450. In *Hepner*, the secured creditor's note provided for the accrual of default interest at the rate of 36%. *Id*. at 453. In response to the Trustee's attempts to have the appropriate rate of interest judicially determined below the 36% default rate, Judge Campbell stated:

> Being guided by a judge's sense of what is fair under the circumstances, as opposed to the language of the Bankruptcy Code and the dictates of non-bankruptcy law, may be a precariously slippery slope. If a bankruptcy court can decide, in particular circumstances, that an otherwise enforceable default interest rate is too high, what restrains it from also determining, without relying on Bankruptcy Code language or nonbankruptcy law, that the amount paid by a debtor on any credit sale of goods or services is inequitable in the circumstances, and thus unenforceable as a claim in bankruptcy? In a climate of skeptical co-equal branches of government and a citizenry that is poorly informed about the import of judicial independence, substituting the court's equitable powers for the marketplace, as it is constrained by legislative dictate, is not without risks to stability of the judiciary that may accompany failure to restrain judicial discretion. This nation's tradition of a "rule of law" embraces the notion of a populace that will accept the courts as ultimate arbiter in applying the law to resolve disputes. In order to maintain this tradition, courts must nurture the public's confidence that courts will not, in the name of judges' vision of justice or equity, substitute judges' will for that of the people, as expressed in the statutes enacted by the people's elected representatives.

> *Id*. at 460.

52. Judge Campbell concluded that "it is not the Court's charge with respect to [the secured creditor's] interest rates to determine what is reasonable or equitable" and, therefore, allowed the secured creditor to accrue default interest on account of its secured claim at 36%. *Id*. Accordingly, any effort by the Debtor to deprive Lender of its bargained for default interest not only violates Section 506(b) of the Bankruptcy Code but also results in Debtor's equity receiving an impermissible and direct benefit. Lender submits this is another instance of "cause" and that

the Court may dismiss this Chapter 11 case for bad faith under Section 1112(b) of the Bankruptcy Code.

C. **If the Court Denies the Motion to Dismiss Under Section 1112(b) of the Bankruptcy Code, the Court may Alternatively Convert the Case to Chapter 7.**

53. If the Court is unwilling to dismiss the case, the Court may still convert the Chapter 11 case to Chapter 7. A conversion to Chapter 7 would be in the best interests of all creditors—not just Lender—as a neutral Chapter 7 trustee would be appointed for the sole purpose of selling the Property as quickly as possible to get *all creditors* paid in full. Such a scenario would appropriately divest the Debtor's equity of being in the self-interested position of turning down sale offers which could pay off all creditors in full but were "too low" as to be acceptable to the Debtor. Accordingly, to the extent the Court does not grant stay relief under Section 362(d)(1) of the Bankruptcy Code, or dismiss the case under Section 1112(b), the Court may still convert the case to Chapter 7 as doing so would be in the best interests of all creditors.

WHEREFORE, Lender respectfully requests that the Court enter its Order which: (i) grants Lender relief from the automatic stay for "cause" pursuant to Section 362(d)(1) of the Bankruptcy Code; (ii) dismisses Debtor's case pursuant to Section 1112(b) of the Bankruptcy Code for "cause"; (iii) to the extent the Court does not dismiss the Debtor's case, converts the case to Chapter 7; and (iv) for such other and further relief this Court deems fair and proper under the circumstances.

**Dated:** Denver, Colorado
April 10, 2018

MOYE WHITE LLP

s/ *Timothy M. Swanson*
Timothy M. Swanson, #47267
Moye White LLP
1400 16th Street, 6th Floor
Denver, Colorado 80202
Email: tim.swanson@moyewhite.com
Phone: (303) 292-2900
Fax: (303) 292-4510
*11380 East Smith RD Investments, LLC*

## CERTIFICATE OF SERVICE

      I hereby certify that on April 10, 2018, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, which will send notification of such filing to all parties receiving electronic notice from the Court's CM/ECF system, and *via* first class mail on the parties identified below and all parties identified on the Debtor's Creditors' Matrix as of April 10, 2018 attached hereto as Exhibit 1.

                                            *s/ Timothy M. Swanson*

11380 Smith RD LLC
c/o Mr. Louis Hard
11380 Smith Road
Aurora, CO 80010
*Debtor*

United States Trustee
c/o Mr. Robert Samuel Boughner
Byron G. Rogers Federal Building
1961 Stout Street, Ste. 12-200
Denver, CO 80294
*United States Trustee*

United States Trustee
c/o Daniel J. Morse
308 W. 21st Street, Ste. 203
Cheyenne, WY 82001
*United States Trustee*

Jeffrey Weinman
730 17th Street, Suite 240
Denver, CO 80202
*Counsel to the Debtor*

Douglas W. Brown, Esq.
Brown Dunning Walker PC
2000 South Colorado Blvd.
Tower Two, Suite 700
Denver, CO 80222
*Counsel to the Debtor*

Adams County Treasurer
Brigitte Grimm, Treasurer
4430 S. Adams Parkway
Brighton, CO 80601

4829-5610-8385.2

```
Label Matrix for local noticing        11380 E. Smith Rd Investments, LLC     11380 SMITH RD LLC
1082-1                                 Kresher Capital                        11380 Smith Road
Case 18-10965-TBM                      3050 Aventura Blvd., 3rd Floor         Aurora, CO 80010-1406
District of Colorado                   Miami, FL 33180-3112
Denver
Tue Apr 10 10:05:57 MDT 2018

Adams County Treasurer                 Robert Samuel Boughner                 Colorado Department Of Revenue
Brigitte Grimm, Treasurer              Byron G. Rogers Federal Building       1375 Sherman St.
4430 S. Adams County Pkwy              1961 Stout St.                         Room 504
Brighton, CO 80601-8222                Ste. 12-200                            Attention Bankruptcy Unit
                                       Denver, CO 80294-6004                  Denver CO 80261-3000

(c)DAVID LAIRD, ESQ.                   Henzel, Tim                            IRS
MOYE WHITE, LLP                        1510 Jade Road                         PO Box 7346
1400 16TH ST STE 600                   Columbia, MO 65201-1702                Philadelphia PA 19101-7346
DENVER CO  80202-1486


(c)SCOTT CALVIN JAMES                  Louis Hard                             Daniel J. Morse
1400 16TH ST STE 600                   7585 S. Biscay Street                  308 W. 21st St.
DENVER CO  80202-1486                  Aurora, CO 80016-1804                  Ste. 203
                                                                              Cheyenne, WY 82001-3669


Owners Insurance Company               Securities and Exchange Commission     Securities and Exchange Commission
Division of Insurance                  Central Regional Office                Midwest Regional Office
1560 Broadway                          1961 Stout St.                         175 W. Jackson Blvd.
Denver, CO 80202-4942                  Ste. 1700                              Ste. 900
                                       Denver CO 80294-1700                   Chicago IL 60604-2815


(c)TIMOTHY M. SWANSON                  US Trustee                             Jeffrey Weinman
1400 16TH ST STE 600                   Byron G. Rogers Federal Building       730 17th St.
DENVER CO  80202-1486                  1961 Stout St.                         Ste. 240
                                       Ste. 12-200                            Denver, CO 80202-3506
                                       Denver, CO 80294-6004

Xcel Energy
P.O. Box 9477
Minneapolis, MN 55484-9477
```

                    Addresses marked (c) above for the following entity/entities were corrected
                        as required by the USPS Locatable Address Conversion System (LACS).

```
David Laird, Esq.                      Scott Calvin James                     Timothy M. Swanson
Moye White, LLP                        1400 16th St.                          1400 16th St.
1400 16th Street, 6th Floor            6th Floor                              6th Floor
Denver, CO 80202                       Denver, CO 80202                       Denver, CO 80202
```

              The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)11380 East Smith Rd Investments, LLC

(u)Brown Dunning Walker PC

(u)Gregory Giometti, Esq.
Gregory R. Giometti & Assoc.
50 South Steele, #480

(d)Henzel, Tim
1510 Jade Road
Columbia, MO 65201-1702

(d)Xcel Energy
P.O. Box 9477
Minneapolis, MN 55484-9477

End of Label Matrix
Mailable recipients    18
Bypassed recipients     5
Total                  23